Jennifer J. Hasso, Esq. [SBN 110636]
**LAW OFFICES OF JENNIFER J. HASSO**
2765 Second Avenue
San Diego, California 92103
Telephone: (619) 232-2765
Facsimile: (619) 232-4485
Email: jhasso@gmail.com

Attorneys for Plaintiffs
RODERIC M. WRIGHT AND BARBARA J.
WRIGHT

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

RODERIC M. WRIGHT and BARBARA J. WRIGHT,

              Plaintiffs,

v.

SIDNEY W. JACKSON, III, an individual; JACKSON, FOSTER & RICHARDSON, LLC, an Alabama Limited Liability Company aka JACKSON & FOSTER, LLC aka J. DON FOSTER, LLC, aka SID JACKSON & ASSOCIATES; DANA L. JEFFRIES, an individual; MICHAEL J. WIERZBICKI, an individual and dba PENSACOLA COURT REPORTING dba WIERZBICKI COURT REPORTING SERVICE,

              Defendants.

**CASE NO.**   '17CV1694 L    MDD

**COMPLAINT FOR:**

1) **Legal Malpractice, Breach of Fiduciary Duty and Ethical Violations**
2) **Negligence**
3) **Bailment**
4) **Conversion**

**DEMAND FOR JURY TRIAL**

     Plaintiffs RODERIC M. WRIGHT (hereinafter "Rod") and BARBARA J. WRIGHT (hereinafter "Barbara") (collectively "Wrights" or "Plaintiffs") by and through their attorneys, based on their own experience and investigation and the independent investigation of counsel and information and belief, allege against Defendants SIDNEY W. JACKSON, III (hereinafter

"Jackson" or "Defendants"),  JACKSON, FOSTER & RICHARDSON, LLC aka JACKSON & FOSTER, LLC aka J. DON FOSTER, LLC aka SID JACKSON & ASSOCIATES (hereinafter cumulatively "JFR" or "Defendants"), DANA L. JEFFRIES (hereinafter "Jeffries" or "Defendants") and MICHAEL J. WIERZBICKI dba PENSACOLA COURT REPORTING dba WIERZBICKI COURT REPORTING SERVICE (hereinafter "WCRS", or "Defendants" or cumulatively "Court Reporters") as follows:

I.

**INTRODUCTION**

1.      Defendants Jackson and JFR represented Plaintiffs in connection with the action styled *Federal Deposit Insurance Corporation as Receiver for Gulfsouth Private Bank v. William L. Amos and Innovation Trend Setters of America, LLC and related Cross-Actions*, Case No. 3:12cv548/MCR/EMT ("Underlying Action"), filed in the United States District Court, Northern District of Florida, Pensacola Division.

2.      Defendants were engaged as counsel for Plaintiffs on or about July 24, 2013 and as counsel for Steve Bunyard, individually and as representative of ZTF, Family, LP and AMT, LLC, by and through Michael D. Smallwood, Esq. on or about July 26, 2013.  A true and correct copy of the Jackson, Foster & Richardson, LLC, Attorney Representation Agreement is attached hereto as **Exhibit "1"**.

3.      In connection with the retention of Defendants Jackson and JFR, Plaintiffs provided confidential information, original source documents, timelines, chronology and summary of all events in such detail that Jackson stated that he was confident he understood the Underlying Action and could and would represent Plaintiffs competently. Plaintiffs had numerous meetings with Defendants Jackson and JFR during which he provided Defendants with timelines organized around the various documents which he had compiled and organized in order to lay out for Defendants the various issues involving the various properties, development and individuals and entities affiliated with each.

2

**COMPLAINT FOR DAMAGES**

4.     In 2013 and 2014, Jackson attended the depositions of Roderic M. Wright, William L. Amos ("Amos"), Joseph Story ("Story") and Jamie Patterson ("Patterson").

5.     On April 3, 2014, the video deposition of Rod was taken by Robert O. Beasley of Litvak, Beasley & Wilson, LLP at 220 West Garden Street, Suite 801, Pensacola, Florida and by J. Robert Hughes before Defendant, Jeffries a Registered Professional Reporter and Notary Public at Large in and for the State of Florida at the offices of Pensacola Court Reporting dba Wierzbicki Court Reporting Service ("Court Reporters").  Present at the deposition of Rod was J. Robert Hughes, Robert O. Beasley, Sidney W. Jackson, III, Seth Wright and Steve Bunyard.  Mr. Beasley conducted the direct examination and Mr. Hughes conducted the cross-examination.

6.     Plaintiff, Rod delivered six (6) large banker boxes of original documents to his deposition on a huge dolly.  Of the six (6) banker boxes, five (5) boxes were marked as exhibits by Mr. Beasley.  All six (6) banker boxes, pursuant to agreement of Jackson and Beasley were left with the Court Reporters. The arrangement was that the boxes would be marked, the Court Reporters would arrange for a copy company to copy the boxes of documents, and the originals would be returned to Defendants Jackson and JFR by Defendants Court Reporters.

7.     Plaintiffs relied on the representations of Defendants Jackson and JFR and Defendants Jeffries and Court Reporters that his original documents would be safe guarded, copied and the originals returned to his attorneys Jackson and JFR. Plaintiffs believed that Jackson and JFR took possession of the originals after they had been copied by Court Reporters.  In or about Christmas of 2015, Jackson informed Rod that Jackson could not work on the trial exhibits during the week of Christmas because he had out of town guests.  It was not until January 15, 2016 that Plaintiffs learned for the first time that Jackson and JFR had lost control of Plaintiffs' documents and did not know where they were. Rod reminded Jackson and JFR that the originals left at the deposition were to have been copied and returned to his firm for safe keeping. Rod also reminded Jackson that Rod had provided copies of most, if not all, of the originals and given them to Jackson to produce to Amos' attorney in 2013 in response to Amos' Request for Production of Documents. Additionally, Rod reminded Jackson that prior to his retention and following, Rod had provided Jackson with timelines which referenced and attached all operative documents in

3

1   chronological order.

2       8.      Meanwhile, Rod based on his concern that Jackson did not appear to know where
3   the boxes of original documents were which had been entrusted to him, located his set of copies
4   and worked feverishly to scan and email them to Jackson.   Later, Jackson reported that Rod's
5   voluminous transmissions had "crashed" Jackson's email server and Rod had to re-send the
6   documents yet another time.   At no time did Jackson inform Plaintiffs that he had missed the
7   cutoff to mark and exchange trial exhibits and/or witnesses.  In fact, Jackson led Rod to rely on his
8   representation that he had everything under control.

9       9.      Further, Jackson without the knowledge or consent of Plaintiffs, entered into a
10  stipulation with the FDIC for the trial to be bifurcated.  Jackson had actual knowledge that Rod
11  had guaranteed the loan with the FDIC.  Even though Jackson was aware of the legal issues, he
12  did not seek or obtain a stipulation from the FDIC to dismiss Rod from his obligations pursuant to
13  the personal guarantee he had given for the loan.   Instead Jackson permitted the claim to go
14  forward solely as to Amos without entering into any agreements with the FDIC as to Rod creating
15  the impression with the jury that only Amos was exposed to the loss which resulted in Rod being
16  exposed to the same liability twice.  Not only did Jackson never ask the FDIC to release Rod from
17  Rod's guaranty, he did not discuss or advise Rod as to the potential exposure of his failure to
18  obtain any agreement from the FDIC at the time the matter proceeded to trial against Amos. After
19  the FDIC won a judgment against Amos, they "could not collect"; they sued Rod in 2016 on his
20  guaranty of the $4 Million. The net result is that Rod is exposed to two separate judgments for the
21  same amounts in two separate lawsuits. Jackson's failed strategy which included entering into a
22  stipulation to bifurcate the trial, allow the same jury to hear both trials with actual knowledge that
23  Rod was not going to participate or be present at the first phase of the trial, along with
24  Defendants' other significant willful and intentional disregard for the rights of the Plaintiffs, in
25  direct violation of Defendants fiduciary duties, and constituted an abuse of process, as well as
26  oppression and fraud by virtue of their false representations, concealment of material facts and
27  knowing and egregious disregard of their fiduciary duties.

28      10.     On the second day of trial in 2016, Jackson told Rod that Jackson had missed the

filing/designation deadline and the trial judge had disallowed all of Plaintiffs' 1,500 exhibits to be used in the trial. Defendants Jackson and JFR did not do anything to mitigate this significant error which Beasley utilized to its fullest advantage during the trial.

11.     During the trial, Plaintiffs discovered that Jackson had not named Wright or any other expert real estate appraisers as expert witnesses even though Jackson knew that the values of the real estate parcels were a material issue in the case. As a result, Rod was not allowed to testify to the value of any of the properties even though Rod knew more about the properties than any other living human being.

12.     Jackson failed to identify and list material witnesses who had first hand information that were directly relevant to the Claims and Counter-Claims even though their names and contact information had been provided by Plaintiffs and their relationship to the Underlying Action and the elements of proof were known. Further, Jackson failed to submit the depositions and/or impeach the testimony of witnesses, Amos, Story and Patterson even though their deposition had been taken a few years prior to the trial and the testimony offered by each was in direct contradiction to prior sworn testimony and impeachment documents which were provided to Defendants Jackson and JFR.

13.     Further, Jackson failed to prepare for trial and could not remember the facts relative to the various properties and did not review the video-taped depositions to refresh his memory. Jackson missed the opportunity to cross-examine Amos and other witnesses called by Amos. Jackson failed to argue that Amos had substantially breached the ITSA agreement and Jackson allowed Blair Mielke ("Mielke") to testify falsely that Mielke was not barred by FINRA from trading and that Rod had caused Mielke to lose millions of dollars. All of the evidence to refute each and every one of these allegations was in Jackson's possession.

14.     Prior to the trial in 2016, Jackson obtained a ruling on his Motion in Limine to exclude any testimony related to the FBI investigation which had been concluded in Rod's favor. However, Jackson raised the issue in his opening statement and repeated references to the "FBI investigation" tainted the jury through the trial without Jackson getting before the jury after it was tainted by his negligence, that the investigation had been concluded in Rod's favor. Indeed, the

5

1  trial judge requested of Jackson on more than one occasion that he file with the Court the case

2  closed letter. Jackson failed to comply with the Court's request to Plaintiffs' severe prejudice.

3       15.    Defendants, Jackson and JFR, Jackson failed to disclose and failed to take steps to

4  mitigate his duties and obligations to Plaintiffs including, but not limited to, objecting to lack of

5  jury instructions on affirmative defenses or propose additional ones, move for summary judgment

6  on legal issues, conceding that plaintiff could inquire into FBI conversations and rejected a

7  limiting instruction that the court proposed, did not object timely during line of questioning re FBI

8  conversations, did not present critical legal arguments either in a motion for summary judgment or

9  during the motion for a directed verdict.

10       16.    As a result of Defendants' and each of them actions, as detailed below, Plaintiffs

11  have incurred significant losses and damages. Plaintiffs seek compensation for all such losses.

12               **II.**

13               **JURISDICTION AND VENUE**

14       17.    This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(l), as

15  complete diversity exists between the Plaintiffs and the Defendants. Plaintiffs are citizens of the

16  State of California. Defendants are citizens of the State of Alabama and Florida. The amount in

17  controversy exceeds $75,000.00.

18       18.    Venue is proper in this district pursuant to 28 U.S.C. §1391 in that the Attorney

19  Representation Agreement in the Underlying Action was entered into in this district.

20       19.    Each of the Defendants at all time relevant has sufficient minimum contacts with

21  California and intentionally availed themselves of the laws of California by entering into and/or

22  administrating contracts with California residents.

23               **III.**

24               **PARTIES**

25       20.    Plaintiff RODERIC M. WRIGHT is and at all times relevant hereto was, an

26  individual domiciled in the State of California. Rod is a member of the California Bar and is a

27  licensed broker in the State of California and Florida. Additionally, for a period of time, Rod was

28  a licensed "Class A" contractor in the State of Florida. Rod is qualified to appraise both

**COMPLAINT FOR DAMAGES**

1  commercial and residential real estate and has been involved in developing real property, both
2  commercial and residential for almost forty years.

3       21.    Plaintiff BARBARA J. WRIGHT is and at all times relevant hereto was, an
4  individual domiciled in the State of California and is the wife of Rod.

5       22.    Plaintiffs are informed and believe, and thereupon allege, that Defendant SIDNEY
6  W. JACKSON, III is and at all times relevant hereto was, an individual domiciled in the State of
7  Alabama and is a member of the Alabama Bar and an equity owner in Defendants, JACKSON,
8  FOSTER & RICHARDSON, LLC, JACKSON & FOSTER, LLC, J. DON FOSTER, LLC and
9  SID JACKSON & ASSOCIATES.

10       23.    Plaintiffs are informed and believe, and thereupon allege, that Defendants
11  JACKSON, FOSTER & RICHARDSON, LLC, is an Alabama Limited Liability Company and is
12  also known as JACKSON & FOSTER, LLC, J. DON FOSTER, LLC and SID JACKSON &
13  ASSOCIATES with its principal place of business in Mobile, Alabama.

14       24.    Plaintiffs are informed and believe, and thereupon allege, that Defendant DANA L.
15  JEFFRIES is an individual domiciled in the State of Florida.

16       25.    Plaintiffs are informed and believe, and thereupon allege, that Defendants
17  MICHAEL J. WIERZBICKI, is an individual dba PENSACOLA COURT REPORTING dba
18  WIERZBICKI COURT REPORTING SERVICE and is domiciled in the State of Florida.

19       26.    Plaintiffs are informed and believe, and based thereon allege, that each of the
20  Defendants were agents, managing general partners, managing members, owners, co-owners,
21  partners, employees, and/or representatives of each of the Defendants and were at all times
22  material hereto, acting within the purpose and scope of such agency, employment, contract and/or
23  representation, and that each of them is jointly and severally liable to Plaintiffs.

24  **IV.**

25  **STATEMENTS OF FACTS**

26       27.    Rod moved to Destin, Florida in the mid-1990's and began working in real estate
27  almost immediately upon moving there from California.  Rod found a waterfront/gulf-front
28

property called Norriego Pointe ("Pointe") that he believed had enormous potential. The Pointe is part of a small peninsula of land that lies in the middle of Destin Harbor. Rod set about getting all the many Army Corps of Engineers ("ACOE") servitudes and spoils easements which since the early 1950's had prevented a host of other developers from using the Pointe, removed so that the property could be developed. The spoils easements that allowed the ACOE to dump its dredge materials ("Spoils") onto the Pointe and other surrounding lands. Additionally, the property was subject to an "avigation easement," established by the Department of the Air Force that limited any proposed structure to a maximum height of 75 feet. The Pointe was subject to repeated wave-action erosion and required a sea wall to protect it. Finally, the Pointe changed it size and location with each "rebuilding" by the ACOE every time the Destin Harbor was dredged, so the original legal description contained a line that "meandered" along the water's edge back to the point of beginning. Rod fought the ACOE, State of Florida, Okaloosa County, and Destin City Council and won. Eventually, the ACOE agreed to remove the Spoils Easements and the avigation easement, all of which had to be approved by various federal, State, County, and City, agencies that ranged from Washington D.C. to Destin City Council.

28. After approximately seven (7) years, he was successful in obtaining the development rights and found partners to provide funds to develop the property. Wright received funds from the transfer of the property and he was owed approximately $15,000,000 and a one-third interest in the net profits as the property was constructed and sold. There was a strong resistance in Destin to Rod building anything on the Pointe because of concerns that it would spoil the view.

29. In about 1996, Rod met Stephen Bunyard ("Bunyard"), who owned Destin Pointe Realty, Inc. and had a desire to develop two parcels of gulf-front land which were owned by AMT, LLC, a Florida limited liability company. One property was "Lot 160" and the second

8

property was "Parcel B" which was comprised of 11.77 acres of pristine white sandy beach property. Lot 160 was a large lot located in the middle of a real estate development, generally called "Destin Pointe," on which Rod was successful in obtaining a development Order for a large commercial-residential building. Rod wanted to increase the density of the building in order to maximize the use. Parcel B was 11.77 acres of pristine sandy beach that had its own ACOE easements, a large T-groin, and a land locked "navigation easement" that served no purpose at this time.

31.     Rod entered into extensive negotiations with Bunyard and his various business entities, over a number of years, and obtained a Letter of Intent (LOI) with Bunyard to combine his properties with Rod's Destin properties so they could be developed to their highest and best use.

32.     In about 2003, Rod sold Norriego Pointe to Pat Barcus ("Barcus") and Tony Cequiera ("Cequiera"). Barcus and Cequiera helped Rod finance a large waterfront home on Joe's Bayou with "deep water access." Rod saw the potential the waterfront home had to be developed into a mini-subdivision of 8 lots, all with deep water access called "Safe Harbour Estates". Rod Wright also borrowed money to do surveying, water management, engineering, and everything that was required in order to finalize the development of Safe Harbour Estates.

33.     In 2007 and continuing into 2008, the real estate market began to falter and Rod was seeking financial partners to help carry and develop the properties. In late 2008, Rod was introduced to Amos and Story by Patterson. Rod did not know Amos, but was relying on the representation that he has financially secure and would be a dependable partner. Together they formed Innovation Trendsetters of America, LLC ("ITSA"). The LOI with Bunyard was assigned to the newly formed entity, ITSA.

34.     Rod refinanced Safe Harbour a number of times and secured the mortgage on Safe Harbour for a total of approximately $3.8 million, however, not all of Safe Harbour was encumbered. The lending bank, Gulf South Private Bank ("Gulf South") had agreed to secure their loan with all but 1.411 acres that was "free and clear." Rod and Amos personally guaranteed the existing approximate $3.8 million dollar loan.  Gulf South reviewed the ITSA agreement and knew that the bank was primarily lending on Amos' financial affidavit.  A few months later in 2009, Amos defaulted on his Gulf South loan guaranty, but did not notify Rod or Story and he immediately took $110,000 out of the $200,000 loan and put it in his personal account.

35.     On January 16, 2009, the three men, as members of ITSA, voluntarily entered into an Operating Agreement for ITSA.  The purpose of the ITSA Operating Agreement was to finance, develop, market, and manage a number of real estate parcels.

36.     In particular, the ITSA Operating Agreement covered the following properties:

   a.   Safe Harbour Estates – a multi-lot parcel in Okaloosa County, Florida

   b.   Destin Pointe Lot 160 in Okaloosa County, Florida (transferred to ITSA via a Letter of Intent between Rod and Bunyard)

   c.   Destin Pointe "Parcel B" – approximately 12 acres in Okaloosa County, Florida (transferred to ITSA via a Letter of Intent between Rod and Bunyard)

   d.   Destin Pointe Realty, Inc. – a real estate company in Okaloosa County, Florida

   e.   The Olympia – a five story yacht-themed condominium in Okaloosa, Florida.

   f.   The right to recover out-of-pocket investments Rod and Barbara made relative to Destin Pointe properties amounting to $1,015,000.00.

   g.   Biloxi, MS 10.1 Acre (a/k/a "Casino") property in Biloxi, Mississippi.

37.     Prior to entering into the ITSA Operating Agreement, the parties calculated the relative fair market values of the properties and agreed to the values reflected in the ITSA

10

Operating Agreement.  Plaintiffs, in good faith, accepted representations made by Amos relative to the value of the Biloxi, MS property and included the property in the ITSA Operating Agreement.

38.    In the ITSA Operating Agreement, Amos agreed to provide equity/operating capital in the amount of $6,000,000.00 to fund the development of ITSA projects and cover operating and marketing costs for the Biloxi, MS property.

39.    The above-referenced $6,000,000.00 Amos was to contribute would "flow from the sale of the Biloxi, MS property or other sources." Amos agreed to be the "financial arm" of the project and pay the carrying costs of the ITSA projects/developments, including, but not limited to, bank loan interest, take out loans, and development fees and costs.

40.    In late 2009, Rod discovered that Amos had misrepresented the zoning designation and value of the Biloxi, MS property as "casino" property.  The Biloxi, MS property, however, was not zoned or indicated for casino use, which significantly reduced the value of the property.

41.    Rod Wright then began efforts to persuade Amos to honor the ITSA Operating Agreement and provide the $6,000,000.00 of equity/operating capital as agreed to in the Operating Agreement so that ITSA projects could progress, or at a minimum provide funding to develop Destin Pointe Lot 160 and Destin Pointe "Parcel B."

42.    Rod spent thousands of dollars of his own money preparing the ITSA properties for development, but was unable to progress with such developments due to Amos failing to provide the $6,000,000.00 in equity/operating capital as agreed to in the ITSA Operating Agreement.

43.    As a result of Amos failing to provide the agreed upon equity/operating capital and failing to provide the funding to develop Destin Pointe Lot 160 and Destin Pointe "Parcel B," the two properties were lost in foreclosure.

11

44.     In addition, in late 2010, Amos held an illegal meeting of ITSA, voted himself the Managing Member, and took/is taking steps to sell ITSA's primary asset, Safe Harbour Estates.

45.     When Rod mortgaged Safe Harbour, the bank agreed to encumber only part of the Safe Harbour land. Rod wanted Amos and Beasley to record the Safe Harbour subdivision. The alternative would have been to split off, legally, the unencumbered portion which could then have been sold separately. However, Beasley and Amos, either did not understand or did not care, and they sold all of it without attempting to obtain a release from the FDIC.

46.     The buyers of Norriego Pointe (Barcus & Cequiera) filed for bankruptcy. The buyers petitioned the trustee for permission to borrow more money and succeeded in encumbering the entire Pointe beyond redemption. Rod filed a claim in the bankruptcy court. The buyers subsequently filed a Chapter 7. A group, GALIC, purchased the property.

47.     Shortly thereafter and without any warning, Rod's records were seized by the FBI/Treasury Department. Rod is informed and believes and based thereon alleges that this action was precipitated by Barcus and Mielke, in an attempt to "bury" him. Approximately two and a half years later the investigation was closed and all records seized were returned to Rod. All attempts to obtain information regarding the circumstances precipitating this action have been rebuffed. Although, typically these investigations are conducted privately, that was not the case with Rod. The FBI's investigation of Rod became the "talk of the town" and the local people had Rod tried, convicted, and sentenced to "18 years" in prison after his records were seized. Rod tried hard to refute these rumors. This was the FBI "stuff" that Beasley made into the reason for Amos to default on his ITSA agreement.

48.     The bank began an action in Okaloosa County, Florida on Amos' guaranty of the approximate $3.8 million note. The bank did not foreclose on the land, initially. They only wanted

Amos to pay off the note and would have allowed ITSA to keep the real property and continue developing all of them.

49.    In 2010, Gulf South commenced an action in Okaloosa County, Florida against Amos on his loan guaranty. Amos then counterclaimed against Gulf South and filed a third-party claim against Rod for fraud in the inducement, etc., but never served Rod Wright. Gulf South was declared insolvent and in 2012, the FDIC became the receiver of Gulf South and took over the action and removed the case to federal court, where it was eventually tried. Rod had not been served in the underlying action and had not been joined by the FDIC. Rod accepted service by Amos; however, the FDIC did not name or serve Rod as a personal guarantor. Rod and Bunyard filed various claims against Amos arising out of his default on the agreements.

50.    In about 2010 or 2011, Jefferson Bank began to foreclose on all of Bunyard's properties. Bunyard lost the properties in foreclosure due to Amos' failure to fund ITSA as he had promised and was committed to perform.

51.    When the ITSA deal was entered into in or about 2009, Amos and Rod Wright each signed a loan guaranty for approximately $3.8 million. Amos was short of funds and had the bank lend him another $200,000. Amos talked Bunyard and Story into personally guaranteeing the $200,000 loan.

52.    In April of 2010, a catastrophic oil drilling incident occurred in the Gulf of Mexico that became known locally as the "BP Oil Spill". The nationwide adverse publicity caused all of Rod's potential lenders to back out of lending any funds to cover Amos' failure or refusal to fund the real estate projects which were in jeopardy of foreclosure.

53.    In about 2013, the FDIC decided to foreclose on Safe Harbour after the case was removed to Federal Court. Amos and Beasley made a side agreement with Story to not sue each other and let Story off the hook. Amos/Beasley entered into an agreement with the FDIC to sell

13

Safe Harbour and apply the sale proceeds to the bank loan. They did not get an appraisal and did not try to get the FDIC to accept the sale proceeds as a satisfaction and release of the approximate $3.8 million loan. The FDIC said that they "didn't ask".

54.     In or about April 3, 2014, the deposition of Rod was taken by Beasley and Hughes. Pursuant to the Notice of Deposition, Rod was required to and did produced 6 banker's boxes of documents.  The boxes were marked by Beasley as Exhibits "1" through "5" and according to the stipulation between Jackson and Beasley the original documents were left with Defendants Court Reporters and Jeffries with the instructions they were to be returned to Jackson after they had been copied. Beasley did not mark box 6 for copying because it had the large plans and historical photos which his client did not want to spend money copying the very large sheets, however, box 6 was also left with the Court Reporters to be returned pursuant to the stipulation between counsel.  Unbeknownst to Rod, Jackson never followed up with the Court Reporter and never retrieved the documents with the exception of one box which was marked Exhibit "3".  Jackson was at all times aware that the boxes contained Rod's original documents to include, original stamped, sealed development orders for Safe Harbour Estates, development order for Lot 160, all of the multiple plans and designs for Parcel B, and thousands of pages of research and transactional documents. Rod was residing in California at the time of his deposition and had no information or knowledge regarding the status of his originals which he had entrusted to Defendants, Jackson, JFR, the Court Reporters and Jeffries.

55.     Rod relied on Jackson to secure the return of his originals after the deposition and to protect and safeguard them for trial as his entire case and ability to prove same, was dependant on these documents.  Through the date of this Complaint, Defendants, Jackson, JFR, the Court Reporters and Jeffries have not accounted for any of the banker boxes with the original documents with the exception of the banker's box identified as Exhibit "3" to the deposition.

56.     On the day immediately before or on the day of the designation, Jackson sent a text on January 15, 2016 at 6:55 a.m. PST stating "Rod—do you have the boxes we gave Beasley?" The failure to protect the documents entrusted to Jackson resulted in the failure to get critical documents into evidence at trial and allowed Beasley to argue to the jury if such documents exist where are they in this courtroom.  Jackson did nothing to bring the issue to the Court's attention, to fall on his sword and bring the issues regarding the original documents on which the entire case was dependant.

57.     Jackson waited until 3-4 days prior to the commencement of trial to tell Plaintiffs that they needed a motion for Judgment as a Matter of Law.  Plaintiffs in order to mitigate their damages, asked Seth Wright ("Seth") to prepare the motion, but Jackson failed to argue the motion.

58.     Defendants failed to raise the following legal issues by way of a summary judgment motion or motion for judgment on the pleadings:  That Amos as a matter of law had not right to rely on any alleged misstatements when he signed the documents in question; that Amos did not have the right to rely on Rod's alleged misrepresentations regarding Safe Harbour Estates, that Amos did not have the right to rely on Rod's alleged misrepresentations regarding Lot 160 and Parcel B; that Amos did not have the right to rely o Rod's alleged misrepresentations regarding the collateral for the Biloxi Property; alternatively that Amos' admitted failure to perform cursory investigation before signing the ITSA operating agreement vitiated reasonable reliance and Amos claims and defenses of fraud were barred by the doctrines of ratification and/or waiver.

59.     Jackson failed to take steps to mitigate his duties and obligations to Rod and Barbara including, but not limited to, objecting to lack of jury instructions on affirmative defenses or propose additional ones, moving for summary judgment on legal issues, conceding that plaintiff

could inquire into FBI conversations and rejected a limiting instruction that the court proposed, failing to object timely during line of questioning re FBI conversations.

60.      Additionally, Defendants failed to prepare for trial, failed to protect the Plaintiffs' from double jeopardy on the loans guaranteed by Rod, failed to object to the same jury hearing both cases with actual knowledge that Plaintiffs had not participated in the first trial and would be materially prejudice by the same jury hearing both matters, and other material omissions which they were required to disclose and mitigate.  Instead on the second day of trial, Jackson said "you should fire me now and sue me for malpractice."

61.      Defendants were negligent when he did not name experts to testify as to the fair market value of Safe Harbour and did not amend the counterclaim to add Beasley and Amos in a negligence action for not having appraised Safe Harbour and for not having obtained a satisfaction of the debt from the FDIC as part of the sale agreement.

62.      Defendants failed to intervene in the FDIC action against Amos and demand that the property be appraised. Defendants failed to advise Plaintiffs of the potential exposure on the FDIC claim as a guarantor who had not been joined to the litigation and not an active participant at the bifurcated trial but a party to the second phase of the trial with the same jury.

63.      Defendants failed to timely notify the Plaintiffs that judgment had been entered and in fact, did not communicate to them that Judgment had been entered until after he had already filed a Notice of Appeal on the last possible day it could have been filed claiming that it was completely accidental that he became aware of same. Defendants failed to timely file post trial motions even though the issues subject of same were meritorious and may have alleviated the need for a very expensive and lengthy appeal process. Defendants, failed and refused in bad faith to mitigate any or all of the damages. Instead, Defendants took the position that he had given the Plaintiffs' "a good trial" and he walked away leaving Plaintiffs with a fraud verdict and an

16

expensive appeal to attempt to mitigate their substantial losses. Defendants continued to act negligently through and including August 27, 2017 when they were relieved as Plaintiffs' attorneys and provided notice of same as Plaintiffs.

**V.**

**CAUSES OF ACTION**

**Count 1- Legal Malpractice, Breach of Fiduciary Duty and Ethical Violations
(Against Jackson and JFR)**

64.     Plaintiffs incorporate and re-allege every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

65.     At all times pertinent herein, Plaintiffs relied exclusively on the Defendants Jackson and JFR for advice and counsel regarding their claims in the Underlying Action. Defendants were obligated by the attorney-client relationship to fully, fairly and competently represent Plaintiffs in all respects. At all times herein, Plaintiffs were advised by Defendants and believed that they could rely on them for advice and trust their decisions. Indeed, Defendants held themselves out as experts in the matters for which they represented Plaintiffs.

66.     At all times during the period of Plaintiffs representations by Defendants, the most confidential, fiduciary relationship existed between them. Defendants were obligated by the attorney-client, fiduciary relationship to deal fairly, justly, and honestly with Plaintiffs, to be loyal to them and to place Plaintiffs' interests before their own interests. The duty of honesty required Defendants to not only avoid making untrue or misleading statements, but to disclose all information reasonably necessary for Plaintiffs to make informed decisions. Defendants were further bound by the Rules of Professional Conduct, as well as the Business & Professions Code statutes regulating and controlling the conduct of lawyers.

67.     During the period of representation, Defendants failed to exercise reasonable care, skill, and diligence in performing legal services for Plaintiffs and were negligent in their

17

representation of Plaintiffs as set forth more fully hereinabove.

68.   Additionally, during the period of representation, Defendants and each of them, breached their fiduciary and ethical duties to Plaintiffs, made affirmative misrepresentations and fraudulent statements to Plaintiffs, failed to disclose and purposefully withheld material information about Plaintiffs' documents and concealed the facts that they had not timely designated experts and/or exhibits for use at trial.

69.   As a direct and proximate result of their negligence and breach of their ethical duties, Plaintiffs have been damaged in the following manner:  They were exposed to a Judgment in favor of Amos in excess of $4,000,000, exposure to a subsequent lawsuit by the FDIC, potential loss of Rod's license to practice law and real estate broker's license based on the jury verdict in favor of Amos and against Rod.  The exact amount of damages for this negligence and breach of ethics by Defendants is not presently known to Plaintiffs but will be proven at trial.

70.   In addition to being both legal malpractice and a breach of their fiduciary duties, the conduct of the Defendants and each of them, as set forth in paragraphs 8-15 and 55-63, involved both affirmative misrepresentations and the concealment of material facts and information from Plaintiffs.  The misrepresentations were made and the concealment of material facts was done for the purpose of misleading the Plaintiffs that Defendants were following up on all matters and timelines in preparing their case for trial. All of said conduct constitutes constructive fraud within the meaning of Civil Code Section 1572.

71.   The conduct of the Defendants as set forth in paragraphs 8-15 and 55-63 were done in knowing violation of their fiduciary duty to Plaintiffs in that Defendants concealed the true facts regarding the status of Plaintiffs' documents, preparation for trial and the fact that they were in control of Plaintiffs' action when, in fact, none of what they represented to be true was in fact true.  Had the Defendants informed Plaintiffs of the truth, instead of doing so after the second day

18

of trial, the Plaintiffs would have had an opportunity to mitigate the losses which followed.

72.     As a direct and proximate result of the conduct of Defendants as set forth herein, Plaintiffs were damaged by being subjected to the fear, anxiety and extreme emotional distress of having to go to trial and being subjected to allegations of fraud which for Rod could potentially mean the loss of his livelihood to include the loss of his license to practice law, the loss of his broker's license and other consequences that go to the very heart of his ability to work and make a living in order to support his family.

73.     The actions of Defendants alleged above constitutes conduct which was carried out by them with a willful and intentional disregard for the rights of the Plaintiffs, in direct violation of Defendants' fiduciary duties, and constituted an abuse of process, as well as oppression and fraud by virtue of their false representations, concealment of material facts and knowing and egregious disregard of their fiduciary duties.  As a consequence thereof, Plaintiffs are entitled to the following:

a.  Emotional distress damages; and

b.  Punitive and exemplary damages in an amount to be determined at trial.

**Count 2- Negligence**
**(Against All Defendants)**

74.     Plaintiffs incorporate and re-allege every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

75.     Defendants, and each of them, owed Plaintiffs a duty to secure, protect, and return all documents which were entrusted to their custody, care and control per the terms of the Stipulation pursuant to which Plaintiffs entrusted the originals to Defendants.

76.     Defendants owed a duty of care to Plaintiffs not only because of their fiduciary obligations to Plaintiffs as attorneys and bailers, but because it was foreseeable that if the original and source documents which were entrusted to them were not returned, Plaintiffs would be

19

1  deprived of the ability to meet their proof at trial.

2  77.   Defendants breached their duties owed to Plaintiffs by failing to return all original

3  documents per the stipulation to the custody and control of Defendants Jackson and JFR.

4  Defendants Jackson and JFR breached their duties owed to Plaintiffs by failing to protect and

5  follow up with Defendants Court Reporters and Jeffries as to the status of the original documents

6  entrusted to them.

7

8  78.   As a proximate result of the negligence of Defendants, and each of them, Plaintiffs

9  have suffered significant special and general damages in amounts to be determined at trial.

10  79.   The conduct of the Defendants and each of them was engaged in with fraud,

11  oppression and/or malice, and was in conscious disregard of the rights of Plaintiffs, so as to

12  warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

13

14  **Count 3- Bailment**
**(Against All Defendants)**

15  80.   Plaintiffs incorporate and re-allege every allegation set forth in Paragraphs 1

16  through 63 and 74-79 as if fully set forth herein.

17

18  81.   Plaintiffs delivered and entrusted their original documents to Defendants pursuant

19  to Stipulation that Defendants Court Reporters would make copies of said originals documents

20  and return the originals to Jackson and JFR.

21  82.   A bailment arises where possession, but not ownership of property is transferred

22  from one party ("bailor") to another ("bailee"). Where a bailee has received a bailment from a

23  bailor, a duty of care is owed. Typically, a bailee is strictly liable for the bailment.

24

25  83.   During the period of bailment, Defendants, as bailee, owed Plaintiffs a duty of care

26  to safeguard their original documents by maintaining reasonable controls to protect the documents

27  and ensure that the originals are returned per the terms of the bailment. As alleged herein,

28  Defendants breached this duty.

84.    As a result of Defendants' breach of this duty, Plaintiffs have been harmed as alleged herein.

### Count 4 - Conversion
### (Against All Defendants)

85.    Plaintiffs incorporate and re-allege every allegation set forth in Paragraphs 1 through 63 and 74-84 as if fully set forth herein.

86.    Defendants willfully and negligently interfered with Plaintiffs' rights to their original documents by failing and refusing to comply with the specific instructions pertaining to the copying and return of the original documents which were entrusted to Defendants, and each of them, by Plaintiffs at the deposition of Rod on April 3, 2014.

87.    Defendants' intentional and deceitful acts enabled it to dispose of the property in a manner inconsistent with Plaintiffs' property rights.

88.    Defendants' failure to return all originals to Plaintiffs has caused substantial damages to Plaintiffs.

### VI.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial concluding with a judgment against Defendants and each of them, for damages as follows:

1.    An award of damages to Plaintiffs in an amount to be proven at trial, but in no event less than $75,000;

2.    An award of punitive damages subject to proof at time of trial;

3.    An award to Plaintiffs of reasonable attorneys' fees and expert fees;

4.    An award to Plaintiffs of costs of suit and interest; and

5.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Jennifer J. Hasso
Jennifer J. Hasso (California Bar No. 110636)

21

COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices of Jennifer J. Hasso
2765 Second Avenue
San Diego, California 92103
Phone:  619-232-2765
Facsimile:  619-232-4485
Email:  jhasso@gmail.com

Attorney for Plaintiffs, Roderic M. Wright
and Barbara J. Wright

### DEMAND FOR JURY TRIAL

Plaintiffs, Roderic M. Wright and Barbara J. Wright demand a trial by jury of all issues so triable.

/s/ Jennifer J. Hasso

COMPLAINT FOR DAMAGES